IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 28, 2014 Session

**TOMMY JOE OWENS v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Campbell County**
**No. 15088     E. Shayne Sexton, Judge**

_____

**No. E2013-01134-CCA-R3-PC - Filed April 30, 2014**

_____

The Petitioner, Tommy Joe Owens, appeals the Campbell County Criminal Court's denial of his petition for post-conviction relief from his convictions of two counts of aggravated child abuse and one count of aggravated child neglect and resulting effective twenty-five-year sentence. On appeal, the Petitioner contends that he received the ineffective assistance of counsel. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JEFFREY S. BIVINS, JJ., joined.

Douglas A. Trant, David M. Eldridge, and Troy S. Weston, Knoxville, Tennessee, for the appellant, Tommy Joe Owens.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Lori Phillips-Jones, District Attorney General; and Scarlett Wynne Ellis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In October 2004, the Campbell County Grand Jury indicted the Petitioner and Charlotte Claiborne for three counts of aggravated child abuse of a child under six years of age, one count of aggravated child neglect of a child under six years of age, and three counts of child neglect. The victim named in the four aggravated child abuse/neglect counts was

the Petitioner's daughter, H.S.[1]  In a separate indictment, Teresa Draughn was charged with one count of failing to report child abuse.  The State moved to consolidate the indictments, and the trial court granted the motion.  Ultimately, however, the Petitioner was tried alone.[2]

The evidence at trial established that the victim was born to the Petitioner and R.S. in March 2001.  State v. Tommy Joe Owens, No. E2007-02296-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 1042, at *3 (Knoxville, Dec. 22, 2009).  In 2002, R.S. and the Petitioner separated, and the victim lived with R.S.  Id.  However, in December 2003, the Petitioner obtained custody of the victim, and the victim was taken away from R.S.  Id. at *4.  R.S. and her family were not allowed to see the victim.  Id.

On June 16, 2004, police officers arrested the Petitioner and his girlfriend, Claiborne, at their home on charges unrelated to this case.  Id. at *11.  At the time of the arrests, the officers did not see any children in the home.  Id.  That night, police officers were dispatched to Draughn's home in response to a report of severe child abuse and found the victim with her eyes swollen shut.  Id. at **15-16.  An ambulance transported the victim to an emergency room where she was treated for injuries all over her body, including a "cauliflower deformity" caused by a "direct blow" to her right ear, a nasal bridge that was "completely flattened against her head," immersion burns to her buttocks and upper back, cigarette burns to her genitals, and bruises caused by a looped cord or coat hanger.  See id. at **19-23.  The victim's eyes were "matted shut and crusted" due to a chemical having been splashed or sprayed in her eyes, and she was dehydrated and emaciated.  Id. at **18, 19.  The emergency room physician who examined the victim estimated that the victim's injuries occurred months to weeks before the victim arrived at the hospital and that the injuries were intentionally inflicted.  See id. at **19-24.

A police officer interviewed the Petitioner about the victim's injuries.  Id. at *16.  The Petitioner told the officer that the victim lived with him; his nine-year-old daughter, K.O.; Claiborne; and Claiborne's twelve-year-old daughter, A.L.  Id. at *17.  The Petitioner claimed he did not know anything about the victim's injuries  Id.  At trial, the Petitioner testified that Claiborne was responsible for the victim's care and that he was unaware of the victim's injuries due to his use of methamphetamine and his work schedule.  See id. at **28-

---

[1]In order to protect the victim's identity, we will refer to her and her mother, R.S., by their initials.  We will also refer to other minor children by their initials.

[2]

The trial transcript reflects that Claiborne pled nolo contendere to aggravated child abuse in counts 1, 2, and 3 and pled guilty to aggravated child neglect in count 4.  On the morning of jury selection for the Petitioner's and Draughn's trial, Draughn advised the trial court that she would be pleading guilty.

29. K.O. testified for the Petitioner that on the day the police officers came to the house to arrest him and Claiborne, the children hid from the officers. Id. at *35. K.O. also testified that the victim injured her ear in a bicycle wreck, that burns on the victim's buttocks occurred when K.O. and A.L. put the victim in hot bath water, and that the victim's eyes were injured when K.O. and A.L. were swinging the victim and the victim "hit a table with her face." Id. at **24-25. K.O. said that she, A.L., and Claiborne inflicted the victim's cigarette burns. Id. at *35. Dr. Diana McCoy, a clinical psychologist, testified as an expert in forensic psychology for the Petitioner that she evaluated him and that he was of average intelligence. Id. at *39. She concluded that during May and June 2004, the Petitioner was experiencing "a lot of stress" in his relationship with Claiborne, that he was staying away from home as much as possible, and that he was having little contact with the family. Id.

The jury convicted the Petitioner of three counts of aggravated child abuse of a child under six years of age based upon the injuries to the victim's nose, ear, and eyes and one count of aggravated child neglect of a child under six years of age, Class A felonies. Id. at *49. The trial court sentenced him to twenty-five years for each aggravated child abuse conviction and twenty years for the aggravated child neglect conviction and ordered that he serve the sentences consecutively for a total effective sentence of ninety-five years. Id. at **40. On direct appeal of his convictions, the Petitioner argued, in relevant part, that the evidence was insufficient to support his aggravated child abuse convictions, that his trial was rendered fundamentally unfair by the loss of taped interviews of the children made by the Department of Children's Services (DCS), that the trial court improperly restricted Dr. McCoy's testimony, and that consecutive sentencing was improper. See id. at **2-3. This court concluded that the evidence was insufficient to support the Petitioner's conviction for aggravated child abuse with regard to the victim's injured nose and that consecutive sentencing was improper, reducing the Petitioner's effective sentence to twenty-five years. Id. at **91-92. This court affirmed the Petitioner's remaining convictions. Id.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely petition for post-conviction relief, raising numerous issues, including that he received the ineffective assistance of trial counsel because counsel (1) misunderstood the rules of joinder, which resulted in his case being improperly joined with Draughn's case and the jury's hearing about her guilty plea; (2) failed to request a missing evidence jury instruction when the State lost the DCS tapes; (3) failed to make an offer of proof regarding Dr. McCoy's restricted testimony; and (4) incorrectly advised the Petitioner to waive ex post facto protections and be sentenced pursuant to the 2005 amendments to the Tennessee Sentencing Reform Act of 1989.

At the evidentiary hearing, the Petitioner testified that trial counsel was retained. He said that at the time of the offenses, his state of mind was "bad" due to his use of

methamphetamine and marijuana. The Petitioner was supposed to go to trial with Teresa Draughn, the victim's baby-sitter, but Draughn pled guilty in front of the jury. The Petitioner said that tape-recorded evidence was missing and that he did not remember if counsel asked the trial court for a missing evidence instruction. Dr. Diana McCoy interviewed the Petitioner several times. The Petitioner said that she also interviewed other witnesses, including K.O. and the daughter "of the girl [he] was living with." However, the trial court limited Dr. McCoy's testimony by ruling that she could not testify about her interviews with those witnesses, and the Petitioner did not remember if counsel made an offer of proof regarding her excluded testimony. He said Dr. McCoy's testimony would have helped his case because she would have testified that he was innocent and "didn't know what was going on."

The Petitioner testified that trial counsel asked him to sign a waiver at sentencing. The Petitioner said that he asked counsel if the waiver was going to "hurt" him and that counsel told him, "[N]o, this has nothing to do with you. . . . [T]his has no bearing on you whatsoever." The Petitioner said that signing the waiver "got [him] more time." He thought that if he had not signed the waiver, his maximum sentence would have been twenty-one years.

On cross-examination, the Petitioner acknowledged that trial counsel was appointed to represent him in juvenile court when DCS began removing the children from his home. Subsequently, the Petitioner's parents hired trial counsel to represent him in the instant case. During a joinder hearing, Draughn's case was joined with the Petitioner's and Claiborne's case. However, during a severance hearing, the trial court severed the counts involving the victim from the counts involving the other children. The Petitioner acknowledged that during another hearing, trial counsel argued that the defense needed the missing DCS tapes and that the trial court should dismiss the case. The Petitioner also acknowledged that although Dr. McCoy was prohibited from testifying about her interviews with the children, defense counsel called K.O. as a witness for the Petitioner at trial. K.O. tried to testify about what she told Dr. McCoy. Regarding the Petitioner's claim that he could have received no more than twenty-one years if he had not signed the ex post facto waiver, the Petitioner explained, "Well, I'm just assuming that was the max before I signed the waiver that they could have give me before I signed the waiver. Then after I signed the waiver, my understanding, it give me -- I agreed to more time." The Petitioner said that the State had offered him a "deal of fifteen years" but that trial counsel told him the maximum sentence he could receive if he went to trial was twenty years. The Petitioner stated, "That's the reason why I took it -- one of the reasons I took it to trial because I thought, you know, it was worth five years to try to clear my name." The Petitioner said that he did not understand the waiver when he signed it and that "I still ain't a hundred percent sure what that waiver was. The only thing I know is I agreed to more time."

-4-

The Petitioner's trial counsel testified for the State that he had been practicing law for thirty-eight years. At the time of the Petitioner's trial in February 2005, ten to fifteen percent of counsel's practice involved criminal law. Counsel had worked in the district attorney's office for four years and had tried about twenty-five homicide cases. Counsel said he was appointed to represent the Petitioner in juvenile court when DCS began the process to terminate the Petitioner's parental rights. Another attorney was appointed to represent Charlotte Claiborne. Trial counsel developed a relationship with the Petitioner, so the Petitioner's family hired counsel to represent the Petitioner in the criminal case.

Trial counsel testified that during the Petitioner's juvenile court case, he cross-examined the emergency room physician who had examined the victim and heard extensive evidence from witnesses. Counsel met with the Petitioner, and they talked about the case and trial strategy. Counsel said the Petitioner was very truthful and "never at any time ever laid a hand on this child whatsoever." He said that the Petitioner had a "disconnect" from Claiborne and the children and that the case against the Petitioner was based on criminal responsibility. The defense's strategy was that people hid the victim's condition from the Petitioner.

Trial counsel acknowledged that he opposed joining Draughn's case with the Petitioner's case. Regarding the missing DCS tapes, the tapes had been delivered to the sheriff's office, but office employees lost the tapes. According to a DCS case worker's report, the children had said on the tapes that nobody did anything to the victim, which was exculpatory to the Petitioner. Counsel filed a motion to dismiss the Petitioner's case based on a Brady violation, but the trial court denied the motion. Counsel said that he had conversations with two of the children in his office but that none of the conversations "were particularly enlightening as to the content of the tapes." Counsel said he did not request a missing evidence jury instruction because he "didn't think it required calling attention to it. . . . It was a judgment call. I chose not to make - ask for an instruction on it, good or bad." He raised the issue of the missing tapes on direct appeal.

Counsel acknowledged that on the morning of trial, in the presence of the potential jurors but before the jury was impaneled, Draughn's attorney announced that she would not be proceeding to trial. Counsel said that he did not object to the announcement because "it was done extemporaneously by the Judge in asking the attorney if [Draughn] was going to plead to something and then the statement came out." He said that he also did not want to call attention to her guilty plea and that "sometimes you just let those things pass on by." Counsel said Draughn's failure to report the abuse actually helped the defense in that it "support[ed] the idea that my client was saying this was hidden from him, not only hidden from him by [Claiborne], the co-defendant, but by others." In fact, counsel introduced Claiborne's guilty plea forms into evidence at the Petitioner's trial as part of the defense's

strategy to show that the Petitioner was "disassociated" and that Claiborne was "doing these acts."[3]

Trial counsel testified that Dr. McCoy "gave fairly extensive testimony" at trial, and he acknowledged that the trial court allowed her to give her opinion about the Petitioner's mental state. However, the trial court did not allow her to testify about information she received from other witnesses, such as K.O. Some of those witnesses, including K.O., testified at trial. Dr. McCoy's report about the Petitioner was introduced into evidence at trial for identification purposes only.

Trial counsel acknowledged that the Petitioner signed a written ex post facto waiver at sentencing and said that "we had a meeting before agreeing to it." Claiborne had received an effective fifteen-year sentence in return for her pleas. Counsel said that the Petitioner's signing the waiver "was an opportunity to argue that the threshold of the sentence should be 15 years and that he wasn't as culpable as the person that the State and the Court accepted a plea on of 15 years, and I thought it would strengthen our argument for that." Counsel denied telling the Petitioner that the waiver "was not about him." Counsel stated, "I wouldn't have said it isn't about him. It's precisely about him. He executes the waiver." Before trial, trial counsel advised the Petitioner that the trial court could sentence him to more than fifteen years if the jury convicted him. Counsel never told the Petitioner that his maximum potential sentence was twenty-one years.

On cross-examination, trial counsel acknowledged that at the joinder hearing, he argued that in order for permissive joinder to apply, a conspiracy had to exist between the Petitioner and Draughn. He also acknowledged that he did not address any other arguments against permissive joinder, stating, "We tried to attack something that [was] more difficult to establish." Counsel did not ask for the missing evidence jury instruction because the trial court could not determine whether the missing DCS tapes had any evidentiary value. Regardless, counsel did not think his failing to ask for the instruction affected the outcome of the trial. Regarding his failure to object to the announcement of Draughn's plea, counsel maintained that the announcement helped the Petitioner's theory of defense. Regarding the trial court's limitation of Dr. McCoy's testimony, counsel testified that Dr. McCoy "testified to substantially what was in her report." As to the Petitioner's signing the ex post facto waiver, counsel said that "I think it's presumptuous to assume the judge [was] going to find [enhancement factors applicable to the sentences]." Counsel said he and the Petitioner discussed "generally the terms of what could be found under enhancement" and the fact that Claiborne's sentence "would work in his favor to get the sentence at the lower end, not on

---

[3]The trial transcript confirms that trial counsel introduced certified copies of the plea forms into evidence at trial.

-6-

the upper end."

In a written order, the post-conviction court denied the petition for post-conviction relief. Regarding the Petitioner's claim that counsel was ineffective because he misunderstood the rules of joinder, which ultimately resulted in the jury's hearing about Draughn's guilty plea, the trial court ruled that the Petitioner was not entitled to relief because counsel's decisions were based on trial strategy. Regarding counsel's failure to request a missing evidence jury instruction or make an offer of proof for Dr. McCoy's excluded testimony, the post-conviction court ruled that the Petitioner was not entitled to relief because this court addressed those issues on direct appeal and found no error or harm. Finally, regarding the Petitioner's claim that the trial counsel incorrectly advised him about the ex post facto waiver at sentencing, the trial court ruled that signing the waiver "placed the Petitioner in an essentially more favorable position" and that, in any event, the Petitioner would have received the same sentence even if he had not signed the waiver.

## II. Analysis

The Petitioner maintains that he received the ineffective assistance of trial counsel. To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363,

369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

## A. Joinder

First, the Petitioner claims that he received the ineffective assistance of trial counsel because counsel misunderstood the rules of joinder of defendants, which resulted in the trial court's improperly joining his and Draughn's cases. Although the Petitioner ultimately was tried alone, he contends that he was prejudiced by counsel's deficient performance because Draughn announced in front of potential jurors that she would not proceed to trial. The State argues that the Petitioner is not entitled to relief. We agree with the State.

Before trial, the State filed a motion to consolidate Draughn's indictment with those of the Petitioner and Claiborne. At a hearing on the motion, counsel for all three defendants was present. The State argued that it was not alleging a conspiracy and was not seeking to join the indictments based on Tennessee Rule of Criminal Procedure 8(c)(2) (2003), which provided for permissive joinder of defendants "[i]f each of the defendants is charged with conspiracy, and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy." Instead, the State argued that the trial court should grant the motion based on Rule 8(c)(3)(ii) (2003), which allowed for permissive joinder of defendants "[e]ven if conspiracy is not charged and all of the defendants are not charged in each count, if the several offenses charged . . . [w]ere so closely connected in respect to time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others." The State reiterated to the trial court several times that it was not alleging a conspiracy in this case. Nevertheless, counsel for the Petitioner continued to argue that the trial court should deny the State's motion because the State failed to prove a conspiracy

between the defendants.

We agree with the Petitioner that trial counsel incorrectly argued that joinder was impermissible under a conspiracy theory. However, our review of the joinder hearing transcript reveals that trial counsel for Claiborne correctly argued that permissible joinder was inappropriate pursuant to Tennessee Rule of Criminal Procedure 8(c)(3)(ii) because the State failed to show "that it would be difficult to separate the proof of the charge against Ms. Draughn from that against Mr. Owens and Ms. Claiborne." Moreover, counsel for Draughn argued that if the trial court granted the motion, "the prejudicial impact [on Draughn] would be enormous." Nevertheless, the trial court granted the State's joinder motion. Therefore, even though trial counsel's conspiracy argument was incorrect, the Petitioner cannot demonstrate that counsel's argument resulted in prejudice.

The Petitioner also claims that defense counsel should have objected when Draughn "announced in front of the jury that she would be entering a plea of guilt." However, trial counsel testified that he thought the jury's hearing about the plea could be beneficial to show that other people tried to hide the victim's condition from him, and the post-conviction court accredited counsel's testimony that his decision not to object to the announcement could be attributed to trial strategy. On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsels' behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Moreover, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). In any event, the Petitioner cannot demonstrate prejudice because he has not offered any evidence to show that the announcement biased the jurors against him. Therefore, he is not entitled to relief on this issue.

## B. Missing Tapes

Next, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to request a missing evidence jury instruction for the lost DCS tapes. Again, we conclude that the Petitioner is not entitled to relief.

During a pretrial hearing, counsel for the three defendants argued that the trial court should dismiss the indictments because the State lost the DCS's recorded interviews with the children. The trial court refused to dismiss the indictments because the children were available and could be called to testify at trial. Tommy Joe Owens, No. E2007-02296-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 1042, at *54. However, the trial court noted that it would give the "duty to preserve evidence jury instruction" if the issue

came up at trial. Trial counsel never requested the instruction.

On direct appeal, the Petitioner argued that he was entitled to a new trial because the State suppressed the exculpatory tapes in violation of Brady v. Maryland, 373 U.S. 83 (1963). Id. at **54-55. This court, analyzing the issue under State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), ruled that the lost tapes did not render the Petitioner's case "'fundamentally unfair'" and that he was not entitled to a new trial. Id. at *58.

The post-conviction court found that the Petitioner was not entitled to relief because this court determined on the direct appeal of the Petitioner's convictions that the loss of the tapes was harmless. We conclude that the post-conviction court properly denied relief on this issue.

The Tennessee Pattern Jury Instructions provide as follows:

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.
>
> If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.23 (16th ed.).

Initially, we note that in its direct appeal opinion of the Petitioner's convictions, this court questioned whether the State even had a duty to preserve the taped interviews. See id. at *57. Therefore, we are not convinced that the Petitioner would have been entitled to the instruction. Regardless, although the missing evidence instruction could have been favorable to the Petitioner, the Petitioner has failed to show that providing the instruction would have changed the outcome of his case. As this court noted in its direct appeal opinion,

K.O. . . . testified at trial that her father never abused H.S. Thus, Appellant was able to put this proof before the jury. Moreover, although A.L., another of the children interviewed by the caseworker, was available to testify, the defense elected not to call her to the stand. It also appears that Appellant was provided with the DCS caseworker's notes concerning the interviews. Finally, it should be noted that information that Appellant did not physically abuse H.S. would not have undermined the State's theory of prosecution that Appellant was guilty because he was criminally responsible for the abuse of H.S. at the hands of Ms. Claiborne and the other children.

Id. at **57-58. Therefore, the Petitioner has failed to demonstrate that he is entitled to relief.

## C. Dr. McCoy's testimony

The Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to make an offer of proof regarding Dr. McCoy's excluded testimony, which prevented this court from fully reviewing the issue during the direct appeal of his convictions. We agree with the State that the Petitioner is not entitled to relief.

At trial, the State objected to Dr. McCoy's testifying about information she obtained during her interviews with the children, arguing that the testimony was hearsay. The trial court sustained the objection. On direct appeal of the Petitioner's convictions, he alleged that the trial court improperly restricted his expert's testimony. Initially, this court noted that the Petitioner failed to make an offer of proof regarding Dr. McCoy's excluded testimony. Id. at *72. Nevertheless, it went on to conclude that the trial court "erred in restricting Dr. McCoy's testimony based upon the evidence violating the hearsay rules." Id. at *75. However, it also concluded that the trial court's error was harmless because Dr. McCoy was allowed to testify fully about her conclusions regarding the Petitioner's mental state, because she was allowed to testify about most of the contents of her report, and because K.O. testified extensively at trial on the Petitioner's behalf. See id. **77-78.

Based on this court's harmless error analysis, we conclude that the Petitioner has failed to show how he was prejudiced by counsel's failure to make an offer of proof regarding Dr. McCoy's testimony. Moreover, as noted by the State, Dr. McCoy did not testify at the post-conviction evidentiary hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on any benefit

these witnesses would have offered to the Petitioner's case. Id. Therefore, the Petitioner is not entitled to relief.

## D. Ex Post Facto Waiver

Finally, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to advise him correctly regarding his right to waive ex post facto protections and be sentenced pursuant to the 2005 amendments to the Tennessee Sentencing Reform Act of 1989. The State argues that the Petitioner is not entitled to relief because the post-conviction court found that the Petitioner would have received the same sentence had he not signed the waiver. We agree with the State.

The indictment alleged that the offenses were committed between April 1, 2004, and June 16, 2004. For offenses committed prior to June 7, 2005, sentencing was governed by prior law, which provided for "presumptive" sentences. The presumptive sentence was the midpoint in the range for a defendant convicted of a Class A felony. See Tenn. Code Ann. § 40-35-210(c), (d) (1997 & 2003). Trial courts were to enhance and/or mitigate a defendant's sentence based upon the application of enhancement and mitigating factors. See Tenn. Code Ann. § 40-35-210(d), (e) (1997 & 2003). The Petitioner was convicted of Class A felonies, which carried a range of between fifteen and twenty-five years, the midpoint in the range being twenty years for a standard, Range I offender. See Tenn. Code Ann. § 40-35-112(a)(2); 39-17-1005(c) (1997 & 2003).

In response to Blakely v. Washington, 542 U.S. 296 (2004), our legislature amended Tennessee's sentencing scheme in 2005 and eliminated presumptive sentences. The amended act also provided that the court set a sentence within the range and consider imposing the minimum sentence. Tenn. Code Ann. § 40-35-210(c)(1). The court "shall consider, but is not bound by" certain "advisory sentencing guidelines," which include that the sentence be adjusted, as appropriate, for any enhancement or mitigating factors shown. Tenn. Code Ann. § 40-35-210(c)(2). However, "defendants who are sentenced after June 7, 2005, for offenses committed on or after July 1, 1982," cannot be sentenced pursuant to the amended sentencing act without a waiver of the defendant's ex post facto protections. Tenn. Code Ann. § 40-35-210, Compiler's Notes.

In the instant case, the Petitioner executed a written waiver of his ex post facto protections; therefore, the trial court sentenced him pursuant to the new sentencing law. In accordance with the new law, the trial court was to begin with the minimum sentence in the range, 15 years, and then adjust the sentence anywhere in the range based on the application of enhancement and mitigating factors. Had the Petitioner not signed the waiver, the trial court would have started at the midpoint in the sentencing range, twenty years. The trial

-12-

court then could have adjusted the sentence based on the applicability of enhancement factor (1), which was based upon the Petitioner's prior misdemeanor criminal history and behavior and did not violate Blakely. See Tenn. Code Ann. § 40-35-114(1); State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007).

Trial counsel testified that he and the Petitioner discussed waiving ex post facto protections and that the decision to sign the waiver was based on trial strategy in that Claiborne, the principle actor, had received an effective fifteen-year sentence. Based on Claiborne's sentence, trial counsel argued at the Petitioner's sentencing hearing that the Petitioner should receive a fifteen-year sentence. As stated previously, this court may not second-guess the tactical or strategic choices of counsel. In any event, the post-conviction court, who also presided over the Petitioner's trial and sentencing, stated that the Petitioner would have received the twenty-five-year sentences regardless of whether the Petitioner signed the waiver. Our review of the sentencing hearing transcript supports the post-conviction court's conclusion that it would have enhanced the Petitioner's presumptive twenty-year sentences to twenty-five years based solely on the Petitioner's four prior misdemeanor convictions and drug use. During the hearing, the trial court stated that the Petitioner's continued use of methamphetamine caused him "[to let] everything go, including his child. That is -- that has weighed very heavily on this Court." Therefore, the Petitioner cannot demonstrate that he was prejudiced by waiving his ex post facto protections at sentencing.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE